IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 7, 2017 Session

FILED
06/13/2018
Clerk of the
Appellate Courts

## HOMEOWNERS OF ASH GROVE ESTATES v. CARLA HURLEY, ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 83CC1-2015-CV-188          Joe H. Thompson, Judge**

_____

### No. M2016-02008-COA-R3-CV

_____

This appeal arises out of a suit to enforce restrictive covenants. Plaintiffs filed suit seeking an injunction to prevent their neighbors from operating a commercial horse facility. After a hearing, the court permanently enjoined Defendants from using or allowing their property to be used for a commercial horse operation and from constructing any additional buildings before they built a residence on the property. The trial court also ruled that Defendants did not have to remove or relocate the already-constructed "run-in shed" at this time, but that once a residence is built, the shed must be removed or moved to the rear of the residence. Defendants appeal. Upon our review, we reverse the judgment enjoining Defendants from conducting a commercial horse operation; in all other respects we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part and Affirmed in Part**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Russell E. Edwards and Michael W. Edwards, Hendersonville, Tennessee, for the appellants, Carla Hurley, Laurale Lowery, and Marcia Johnston.

Elizabeth Sitgreaves, Brentwood, Tennessee; and C. Jay Ingrum, Gallatin, Tennessee, for the appellees, Homeowners of Ash Grove Estates, Ken LouAllen, Sr., Vicki LouAllen, James Wallace, Jamie Wallace, Paul Curd, Jr., Paul Curd, Sr., and Teresa Curd.

## OPINION

### I.     Factual and Procedural History

Carla Hurley, Laurale Lowery, and Marcia Johnston (collectively, "Defendants") purchased an 18-acre tract of land in Ash Grove Estates in Sumner County at an estate

auction in 2009. The property, known as Tract 7, is subject to restrictive covenants, including that "each residence . . . must have a minimum total of 2000 square feet of interior heated floor space" and that "[s]tock barns are permitted but must be to the rear of the dwelling." The covenants permit horses to be kept on the tracts but prohibit other types of animals. Defendants have constructed a barn-like structure they refer to as a "run-in shed," which measures 36 feet by 50 feet and provides shelter for the horses, hay, and equipment they keep on the property.

On February 25, 2015, several of the neighboring homeowners in Ash Grove Estates, namely Paul M. Curd, Sr., Paul M. Curd, Jr., Teresa Curd, Ken LouAllen, Vicki LouAllen, and James Wallace (collectively, "Plaintiffs"), filed a petition seeking a restraining order or other injunctive relief to prevent the Defendants from constructing a commercial horse training facility on their property. The petition alleged that construction had already begun that disregarded certain restrictive covenants. A hearing was held, after which the court entered an order holding that "there was no immediate 'irreparable' harm being done," that "any harm that was being done could be remedied," and advising Defendants "that any further work on the building, except for the addition of gutters and gravel, should cease pending a final hearing;" the court did not enter an injunction. The matter was set for trial on June 16, 2015; for reasons unclear from the record, the trial was not held on that date.

Following a fire that destroyed a barn on another property owned by them in November 2015, Defendants filed a motion on December 9, seeking the court's permission to "add stalls and a lean-to to the existing structure" on Tract 7 to shelter the horses from the other barn that had been destroyed in the fire. The trial court denied the motion in an order entered December 30, and set the case for trial for February 26.

Plaintiffs filed an amended petition on January 25, 2016; Defendants answered, denying most of the allegations and denying that they "knowingly, willfully violated the Declaration of Covenants, Conditions and Restrictions for Ash Grove." For reasons not clear in the record trial was not held on the scheduled date; rather, a hearing was held and an order entered on March 2 permitting the Defendants to "assume the risk and build a 10' by 10' feed room onto the existing barn structure on their property."[1] The order also required Defendants' counsel to file a description of the Defendants' current and prospective uses for the property within 20 days. On March 28, Plaintiffs moved the court to "visit the property with or without counsel for both parties." Defendants did not file a response to the motion. Following a status conference the court entered an order granting the motion, stating that the court, counsel, and a representative of each party, if desired, "shall visit the property in question after the final hearing set for June 27, 2016, in order to assist the Court in making its ruling in the matter at hand."

---

[1] There is no transcript of these proceedings on February 26 in the record.

The court entered a Memorandum Opinion and Order on September 9, stating that:

As framed by the litigants, the two issues before the court are:

1. What Lead Me On Farm, LLC[2] activities may be conducted on Tract #7?
2. What constitutes the "front" of the property for purposes of determining where the "rear of the residence" is located?

The court found that the restrictive covenants "permit horses to be kept on a non-commercial basis" and that a residence proposed to be constructed on the tract should "face north towards the easement giving access to the property." The court permanently enjoined Defendants from using or allowing their property to be used for a commercial horse operation and from constructing any additional buildings prior to constructing a residence.

The Defendants appealed, and this Court remanded the case for entry of a final order.[3] While the case was on remand, Plaintiffs moved the trial court to rule on the issue of whether the "run-in shed" should be removed; Defendants opposed the motion. After a hearing on April 3, 2017, the court entered a final order memorializing the parties' agreement that neither party would be awarded attorney's fees; ruling that the Defendants did not have to remove or relocate the run-in shed; and modifying the memorandum opinion and order to require that "at the time a residence is built on the Defendants/Appellants' property, the restrictive covenants must be complied with by either removing the run-in shed or moving it to the rear of the residence." The Defendants appeal, raising the following issues for our review:

1. Whether the trial court erred by *sua sponte* ordering one of the Appellants to submit a document that contains hearsay as a late-filed exhibit at the trial;
2. Whether the trial court erred by visiting the *locus in quo*;
3. Whether the trial court erred by permanently enjoining the Appellants from using their property for a commercial horse operation;
4. Whether the trial court erred by permanently enjoining the Appellants from constructing any additional buildings on their property prior to the construction of a residence; and
5. Whether the trial court erred by requiring the Appellants to remove the existing run-in shed at the time a residence is built on their property or move it to the rear of the residence.

---

[2] Lead Me On Farms, LLC, is owned by Defendants Marcia Johnston and Carla Hurley.

[3] We concluded that the September 9 order was not a final order because it did not address the Plaintiffs' claim for attorney's fees.

## II.  STANDARD OF REVIEW

The judgment was rendered after a non-jury trial; accordingly, it is "subject to our *de novo* review upon the record of the proceedings below.  Tenn. R. App. P. 13(d) mandates that there is a presumption that the trial court's findings of fact are correct, and we must honor that presumption unless the evidence preponderates to the contrary." *Cannon v. Loudon Cty.*, 199 S.W.3d 239, 241 (Tenn. Ct. App. 2005) (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)).  For the evidence to preponderate against the trial court's factual finding, it must support another finding of fact with greater convincing effect.  *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 70–71 (Tenn. Ct. App. 2000).  We afford no presumption to the correctness of the court's conclusions of law.  *Cannon*, 199 S.W.3d at 241 (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996)).

## III.  ANALYSIS

Restrictive covenants are property interests that run with the land but arise from a series of contractual transactions; accordingly, they are treated as contracts and construed using the rules of construction applicable to other contracts.  *Maples Homeowners Ass'n, Inc.*, 993 S.W.2d at 38-9.  To determine whether a contract's language is ambiguous, this Court in *VanBebber v. Roach* has explained:

> The language in dispute must be examined in the context of the entire agreement. The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. A strained construction may not be placed on the language used to find ambiguity where none exists.

252 S.W.3d 279, 284 (Tenn. Ct. App. 2007) (internal citations and quotations omitted).  When the language in question is not ambiguous, the court must look no further than the four corners of the document to discern its meaning. *Kiser v. Wolfe,* 353 S.W.3d 741, 748 (Tenn. 2011) (quoting *Whitehaven Cmty. Baptist Church v. Holloway,* 973 S.W.2d 592, 596 (Tenn. 1998) ("'An elementary precept of contract law' is that when the language is clear, courts must not look beyond the four corners of the instrument.")).  Because construction of a contract is a matter of law, we review the covenant's language *de novo*, with no deference to the trial court's ruling. *VanBebber*, 252 S.W.3d at 284.

In *Williams v. Fox*, the Tennessee Supreme Court held:

> [R]estrictive covenants are not favored in Tennessee because they are in derogation of the right of free use and enjoyment of property. Therefore, such restrictive covenants are strictly construed. Courts refrain from extending a restrictive covenant to any activity not clearly and expressly prohibited by its plain terms. When the terms of a covenant may be

4

construed more than one way, the courts must resolve any ambiguities against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property.

219 S.W.3d 319, 324 (Tenn. 2007) (internal citations omitted). This Court has also explained:

The courts enforce restrictions according to the clearly expressed intentions of the parties manifested in the restrictions themselves. We give the terms used in restrictions their fair and reasonable meaning, and we decline to extend them beyond their clearly expressed scope. We also construe the terms of a restriction in light of the context in which they appear. . . . [F]inally we should resolve all doubts concerning a covenant's applicability against applying the covenant.

*Maples Homeowners Ass'n, Inc. v. T & R Nashville Ltd. P'ship*, 993 S.W.2d 36, 39 (Tenn. Ct. App. 1998) (internal citations omitted).

### A. Whether the Court Correctly Construed the Restrictive Covenants

Inasmuch as they involve the court's interpretation and application of the covenants, we begin our analysis by consolidating issues 3, 4, and 5 raised by Defendants. The covenants most pertinent to these issues state:

NOW THEREFORE, in consideration of the premises, the undersigned does hereby impose the following restrictive covenants on tracts 1 through 10 of the Ash Grove Estates which shall be covenants running with the land and binding upon any and all persons, firms, corporations, or other entities, for a period of thirty (30) years from date hereof, and which are as follows:

1. Each residence (on tracts 1 through 6) must have a minimum total of 2000 square feet of interior heated floor space, with a minimum of 1500 square feet on the ground level. The framing of the dwelling must be wood or steel and all houses must have exterior walls covered with at least 80% brick. The remaining 20 % may be vinyl siding, western cedar siding, or some comparable siding. No one side of any residence can be completely vinyl. Engineered log homes are permissible if they have at least 2000 sq. ft. of heated floor space and have brick or rock to grade. No doublewide or singlewide mobile homes will be permitted. Any detached garages must be to the rear of the residence and constructed in the same character as the residence. Stock barns are permitted but must be to the rear of the dwelling. Tracts 7 through 10 will have the same restrictions but will allow LEED certified houses that will not use brick in the construction.

5

2. No swine or poultry shall be allowed or maintained on any lot at any time. Also no fowl and/or commercial birds, of any kind shall be allowed or maintained on any lot at any time. No dog kennels of any kind shall be allowed or maintained on any lot at any time. Horses and cows can be kept on these tracts.

The parties agree that there is no ambiguity in Covenant 1. We agree and also find that there is also no ambiguity in the language at issue in Covenant 2. Consequently, we look no further than the covenants to discern their meaning.

### 1. Whether Commercial Horse Operations Are Permitted

We first examine whether the trial court properly enjoined Defendants from engaging in commercial horse operations. Covenant 2 prohibits swine, poultry, foul, commercial birds, and dog kennels but explicitly permits horses and cows to be kept on the tracts in Ash Grove Estates. The covenant does not limit the presence of or expressly prohibit commercial activity relating to horses or cows, as it does for other types of animals, such as swine, poultry, and "fowl and/or commercial birds." Accordingly, enjoining Defendants from conducting a commercial horse operation extends the restriction beyond the literal meaning of its terms. *See Shea v. Sargent*, 499 S.W.2d 871, 874 (Tenn. 1973). We reverse the trial court's holding in this regard.

### 2. The Injunctive Relief Imposed

Defendants argue that the court erred in enjoining them from constructing additional buildings on the property prior to constructing a house. Covenant 1 sets forth minimum size and appearance requirements for "each residence" on all ten tracts.[4] It permits detached garages and stock barns to be located on each lot, but requires that both types of buildings must be to the rear of the residence. Thus, a house must be constructed in order to provide a reference point for the placement of the barn. The trial court properly concluded that the Appellants must construct a dwelling if they wish to construct barns and other similar structures.

---

[4] Covenants 3 through 7 also address the appearance of the residences on the tracts:

3. No recreational vehicles (motor homes, campers, etc.) allowed as a dwelling.
4. No below ground level basement homes allowed.
5. No trash, junk or junk vehicles (those that do not run on their own power) shall be kept on the property. All lots must be kept mown and of neat appearance (unless open areas are planted in trees).
6. Buildings on this property as of this date can remain, but must be kept in as good a state of repair or demolished and removed.
7. No existing houses shall be moved from another location to this property.

6

**B. The Court's Finding as to the "Front" of the Property**

Defendants also take issue with the determination that they must relocate any barns to the rear of the as-yet-to-be-built residence.[5]

The trial court ruled as follows:

> With respect to the second issue raised by the parties, the Defendants posit that the "front" of the property for determining the location of garages or ["]stock barns" required to be built at the "rear of the dwelling" or ["]rear of the residence," is the southern end of the property. The court finds this argument to be without merit. No other home on any of the lots faces away from either St. Blaise Road, or the easements providing access to Tracts 7, 8, 9 and 10. It is clear that the intent of the restrictive covenants was to require the residence on Tract #7 to face north towards the easement giving access to the property.

Based upon this finding and the current location of the run-in shed at the front of the property, leaving no room for a dwelling to be built in front of it, the trial court ordered that Defendants move the run-in-shed once they constructed a dwelling.

The covenants do not state where the front of the property is for purposes of construction, application, or enforcement. Under the circumstances presented, determining the "front" of the property required the parties to put on proof, resulting in the court's finding that "No other home on any of the lots faces away from either St. Blaise Road, or the easements providing access to Tracts 7, 8, 9 and 10," and the order that a residence on Tract 7 should also face north toward the easement. We afford a presumption of correctness to a trial court's findings of fact and will disturb those findings only where the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).

Defendants do not cite to evidence that preponderates against the finding of the trial court; they argue that the court gathered information, not admitted as evidence at trial, about the orientation of the houses during its visit to the property and improperly considered it to determine where the front of the property was.[6] In response, Appellees contend that the photos and plat maps admitted at trial, as well as the testimony of Ken

---

[5] In this regard, Defendants state in their brief that "The Appellee never properly asked the trial court in its petition or amended petition to make this decision." While Defendants assign error with the determination made by the court, they do not assert as an issue for resolution on appeal that the court erred in making the determination. Indeed, as more fully explained herein, the determination of the "front of the property" was necessary to the application of the covenants and the exercise of the injunctive power of the court.

[6] The contentions relating to the trial court's visit to the property will be addressed in section D, *infra.*

LouAllen, provide evidence of the front of the lots in the Ash Grove Estates development.

The testimony of Mr. LouAllen supports the trial court's finding in this regard; he testified as follows:

Q. All right. Now, when you knew that they had built the barn, the run-in shed or whatever you want to call it, that's there -- now, you said they built that at the front of the property. Why do you say it's at the front of the property?

A. Because it's the ingress that you have that's at the front of the easement, the way that you enter the property. You only have one way of entering that property and that's from the front. It's surrounded and land locked on three other sides; so that's the front of the property. . . .

Q. Where the run-in shed is built, is that at the close[s]t corner of Saint Blaise Road?

A. Yes, sir.

Q. And if they argue or state that they're going to build a house facing the pond and so therefore their barns will be behind the house. What do you say to that idea?

A. They're straining gnats and swallowing camels, that's what I say to it. Because, basically -- but I don't know how to say it -- it is preposterous to think that you're going to drive past all of this to get to your house. The house is going to be – there's not enough room, number one.

Number two, where they're planning on putting their second barn and the riding arena is where the good soils for the septic systems are supposed to be. And so that's going to void the septic systems for an existing house. If they want to build a house up there and put all their stuff behind it, I have no issue with it whatsoever. But to have that big main entrance to mine and Mr. Wallace's house, and then it will ruin the lot next door to it because it's on the front and backs right into the backyard to the lot next door to it.

\*\*\*

Q. Now, can you describe for the Court the lay out of this property out there? Where all the plaintiffs' homes are in respect to where the defendants' property is?

A. All of our homes surrounds the defendants' property. . . . It's wide and deep. And it has, like, a 3 or 4 acre pond at the rear of it. And it all runs down toward that pond. All that area catches towards that pond. The good soils and the building sites, in my professional opinion, are at the front of that property. When I say "front," the road -- a part of that property

8

that's actually closest to Saint Blaise Road that's actually adjacent to the ingress to it.

Q. Right. So when you're saying "front" you're not only saying closest to Saint Blaise but closest to the easement that comes off of Saint Blaise?

A. Yes, sir.

Q. And I think their attorney represented that they could come into the rear of the property. Do you know of any way --

A. You can't get into the rear of that property. There's no ingress to the rear of that property.

Q. The only way they're getting into the back is if they parachute in or they fly in with a helicopter?

A. Yes, sir.

\*\*\*

Q. Okay. There's nothing in these covenants and restrictions that tells which is the front and which is the back?

A. No, sir. Generally it's just common sense.

We have reviewed the exhibits and the testimony and conclude that the evidence does not preponderate against the finding that the front of the property faces north toward the easement giving access to it. Accordingly, we affirm the finding that the property fronted on the easement giving access to it and the order requiring the run-in shed to be moved behind the residence once constructed, as there was no room for a residence in front of the shed/barn, as required by the restrictive covenants.

### C. Evidentiary Issues

Defendants argue that the trial court "erred in augmenting the record on its own initiative by ordering that the flyer/brochure [advertising the sale of the property at issue in this case] be introduced into evidence as a late-filed exhibit." Defendants contend that the document "contains a lot of hearsay in the form of the descriptions and opinions about the property that are prejudicial to the appellants' case."

At trial, the court engaged in the following colloquy with Ms. Lowery:

THE COURT: Ms. Lowery, let me ask you a question. Did I remember correctly that you did attend the auction with Ms. Hurley?
THE WITNESS: Yes, sir, I did.
THE COURT: And Ms. Johnston was not present?
THE WITNESS: She was not there.
THE COURT: Were there auction fliers?
THE WITNESS: Yes.
THE COURT: Did you keep them?

9

THE WITNESS: Yes. I don't know if I still have one.

THE COURT: I want the auction flier from the auction made a late-filed to her testimony. It will be Late-Filed Exhibit Number 18.

MR. INGRUM [counsel for the Plaintiffs]: I would follow that, Your Honor, because I would like to see it. My clients don't have a copy.

THE COURT: All right. Well, if she didn't I was going to ask your client. And then -- was it Carman Realty that conducted the auction?

THE WITNESS: Yes, sir.

THE COURT: That was going to be step number three to see if they archived it. But if the defendants have that auction flier I'd like for that to be made Exhibit Number 18.

The defendants subsequently submitted the flyer to the court, which the court discussed in its order, stating:

> In determining the intent of the parties, the court places special emphasis on Exhibit #18, the advertisement/flyer made available to the parties on the date of the auction, September 19, 2009. Among other statements, the flyer includes the following:
>   • "Real Estate consists of 90.94 Choice acres that is being divided and sold in 10 separate Estate Lot tracts."
>   • This property is in a prime location and a perfect spot for your new home.
>   • This property is perfectly suited for an Estate Lot home or is a prime property for development.

Appellants contend that the direction that this brochure be made an exhibit was a violation of Rule 614 of the Tennessee Rule of Evidence. That Rule provides:

> **Rule 614. Calling and interrogation of witness by court.**
> **(a) Calling by court.** The court may not call witnesses except in extraordinary circumstances or except as provided for court-appointed experts in Rule 706, and all parties are entitled to cross-examine witnesses thus called.

Tenn. R. Evid. 614(a). In examining Rule 614, this Court has stated:

> That rule would also apply to the production of documentary evidence. Documentary evidence is only properly admissible after a witness lays a foundation. As one commentator on Tennessee law has stated:

>> Under the Anglo American trial process, lawyers for the parties have the responsibility of deciding which witnesses to call and what questions to ask. The judge is a neutral

10

participant who generally refrains from direct involvement in the presentation of proof, other than to rule on objections by counsel.

*Lien v. Metro. Gov't of Nashville and Davidson Cty.,* 117 S.W.3d 753,763 (Tenn. Ct. App. 2003) (citing Cohen, Sheppeard and Paine, *Tennessee Law of Evidence* § 6.14 .1 (4th ed. 2000)).

Defendants did not object to the court's request for the introduction of the flier on the basis of Rule 614, nor did they object on the basis that it, in their view, contained hearsay; they did not seek to reopen the proof when they submitted the document to the court. Both Mr. LouAllen and Ms. Hurley testified about the auction, thus laying a foundation for the admission of such evidence. In light of the record and the manner in which this evidence came to be admitted, we do not conclude that the court violated Rule 614. In any event, as noted earlier, the restrictive covenants at issue are not ambiguous, and the exhibit is irrelevant to our consideration of the issues on appeal, as neither we nor the trial court needed look any further than the four corners of the document to determine whether the Defendants' activities are permissible and whether they were required to build a residence.

**D. Whether the Court Erred in Visiting the Property**

Defendants also argue that the trial court erred by visiting the property in question when it "obviously found evidence from its visit to the property that was not properly introduced into evidence otherwise." Specifically, Defendants argue that the court's findings that "The Property along St. Blaise [Road] adjacent to Ash Grove Estates is predominantly, if not exclusively[,] residential" and that "[n]o other home on any of the lots faces away from either St. Blaise Road, or the easements providing access to Tracts 7, 8, 9 and 10" were based on the court's viewing of the property, not the evidence presented at trial. Plaintiffs contend that the Defendants have waived this issue by failing to object to the visit in the trial court, and, if the issue is not waived, that the court's findings are supported by the exhibits and testimony of Mr. LouAllen.

Relative to the trial court's visit to the property, in *Tarpley v. Hornyak*, this Court held:

[A] trial judge has the inherent discretion to take a view of the site of a property dispute, a crime, an accident, or any other location, where such a view will enable the judge to assess the credibility of witnesses, to resolve conflicting evidence, or to obtain a clearer understanding of the issues. However, the view cannot be made to obtain additional evidence or to replace the requirement that evidence be produced at trial with the judge's personal observations of the site. Thus, the proper purpose of a view is to enable the judge to better understand the evidence that has been presented

11

in court, not as a substitute for such evidence. Any determination of factual issues in a case where a judge has taken an on-site view must be supported by significant and material evidence in the record. Appellate courts will review such evidence appearing in the record under Tenn. R. App. P. 13, and where the evidence independent of the judge's personal observations preponderates against the finding, it is subject to being reversed on appeal.

174 S.W.3d 736, 749 (Tenn. Ct. App. 2004). In this case, the court visited the property after the trial with representatives of both parties in attendance. At trial, Mr. LouAllen testified that the property that was split up for auction "was marketed for estate homes that had restrictive covenants to keep it from being anything other than residential estate area." He also testified about the owners of the other plats, and where their homes were or would potentially be located once built. The plat maps admitted at trial indicate the residential nature of the area, and the restrictive covenant itself contains explicit details about the minimum size and building materials to be used in the residences built on the tracts.

We have reviewed the findings that Defendants contend were the result of the judge's visit to the property in light of the entire record. We conclude that the testimony of Mr. LouAllen and the exhibits placed into evidence provide substantial and material evidence that supports the court's findings, such that the judge's visit to the property did not result in an improper substitution of what he observed for the evidence submitted at trial by the parties.

IV.  CONCLUSION

For the foregoing reasons, we reverse the judgment enjoining Defendants from conducting a commercial horse operation; in all other respects we affirm the judgment of the trial court.

_____
RICHARD H. DINKINS, JUDGE